Good afternoon, Your Honors. Brian Mosley on behalf of Kool Radiators, the appellant. And I would like to reserve five minutes of my time. I'll attempt to do that on my own. Today, on this de novo review, our question is essentially, are there any material facts in dispute that need to be resolved by the jury? I'd like to first address why there is a material dispute about whether Mr. Evans was acting in his capacity as an accountant and providing professional services. And second, I'd like to talk about why the fraud result in the state court case cannot be applied through collateral estoppel to this matter. So beginning with that first question of professional services, there's no dispute about which sections of the contract we're talking about. Professional services are described as being either performed for remuneration that inerts to the benefit of the company, or pro bono services, which if at the time such services were undertaken, a partner, officer, or director approved the rendering of such services without compensation. Now the district court correctly found that there was a dispute about whether Mr. Evans was acting on behalf of the charter jet company, on his own behalf, on behalf of Harner Evans. Because he used his Harner Evans stationary, he used his Harner Evans email and phone number, he provided normal accounting services such as reviewing their books, and he also, with respect to our clients, provided investment advice. He advised our clients on how to structure the investment. Normal kind of services that would be covered under professional services. Structure the investment, he asked for $250,000, and he got it. But what was the structure of the investment other than give me $250,000 and you'll own a piece of Aegis? He was advising him on how it might be structured in terms of coming through a retirement account or a retirement structure as opposed to just an Where is that in the record, please? That is, sorry, Aaron. That's in the record at ER 214. 214? At ER 2 at page 14. At 14, okay. And so the question here in the dispute is really about what constitutes pro bono services and whether the jury could reasonably infer from this disputed facts that he was, in fact, providing pro bono services. And our position is that if he was acting on behalf of Harner Evans, he was either acting for remuneration, he was receiving pay, or he was acting pro bono. And as a partner, he approved his own actions. The exclusion here really would only apply if, for instance, an associate went off moonlighting on the weekend, took on some dangerous engagement, didn't have approval from a partner or someone in authority at the time. That would be excluded by this. But pro bono services in general are covered. And so we would ask you to agree and affirm. I mean, how is it pro bono when you're asking for a $250,000 investment? How could you characterize that as pro bono work? And you get $32,000 out of that. Right. So that gets into the question of whether it was negligence, whether it was fraud. No, it gets into the question of whether it was pro bono work. Correct. So if you were to find that he got $32,000 from this and it redounded to his benefit, and then he would be covered by it. But pro bono services, as defined under the contract, there's no specific definition that says what they are and what they aren't, that it has to be for indigent people. And under Arizona case law, the question is, what would an average person, a layman who's not trained in the law, think when they hear the word pro bono? And so if I say to you, look, I'm an investment advisor. I've got some great pro bono advice for you. I'm going to give you this advice pro bono, okay? You want my pro bono advice? Invest $250,000 in my company, and I'm giving you that advice pro bono. I mean, what authority do you have that something like that could be considered pro bono? The question is? Can you point to some authority that stands for the proposition that a transaction like that could be considered pro bono? I don't have any authority interpreting a contract such as this. The question is really under this insurance contract, whether pro bono is defined in a way that would exclude what he did. But I would think you would be able to point to something that would suggest that the ordinary meaning of the term pro bono could include a solicitation of a $250,000 investment. Well, pro bono, even the legal definition cited by Continental Casualty out of Black's Law Dictionary, says pro bono services are uncompensated, especially for indigents. Right. But the first part is uncompensated, and at bottom, that is the definition of pro bono. How is that uncompensated? How is it uncompensated? Yeah. Well, it's uncompensated in terms of Harner-Evans. It inerts to his personal benefit, perhaps. There's language where he says, I was doing this in my personal life because I was personally invested, and I was trying to negotiate this deal. And so he did have some personal benefit from it. But the question under coverage for the contract is whether Harner-Evans received any benefit as a result of this transaction. And if not, then it can be. Whether Harner-Evans received any benefit? That's correct. So there's two ways that it can be covered under professional services. Right. It was not work performed for remuneration that went to Harner-Evans, that benefited Harner-Evans. But it was also not pro bono work. I mean, it seems like what you're saying is no matter what Evans did, no matter what he did, if it was not performed for remuneration that benefited Harner-Evans, by definition it must have been pro bono work. So if he was driving down the street and hit somebody with a car, Harner-Evans doesn't get a benefit, so it must be pro bono work. No, that's not our position. Respectfully, our position is that when he is performing normal accounting functions, such as providing investment advice to his former clients, and when he chooses not to bill them for those services, that he is making a choice to do that without compensation. And that's covered. And if you think about it, that makes sense for someone who's covered as a professional. You want to be able to charge your clients. You want to be able to have the discretion not to charge them. That discretion is not given to associates. It's only given to partners and to directors under this contract. But the idea of providing ongoing services, little services here and there, to existing clients or former clients or future hopeful clients, is a normal way of doing business, and they haven't defined it. And I'm not asking for a per se rule. I am saying that the issue here is whether a jury could reasonably find that because he was acting as a Harner-Evans accountant, because he was using their letterhood, that he must have been performing some accounting services for them. And if so, could they reasonably conclude that he did so pro bono? And if they could. Is the link then the letterhead? The link is all the things we cite in the record. It includes the letterhead. It includes the fact that he was performing normal accounting services. He was providing these advices on how to structure the investment. He was providing advice. But, for example, I referee my daughter's basketball game sometimes, and I might use my Judge Owens email account to tell all the coaches, hey, we're going to play this Saturday. So I may send an email from my judge account, and I'm judging in a sense because I'm judging whether the ball was in or out. Would I be performing judicial functions if I'm refereeing my daughter's sixth-grade basketball game? No, but there's we submitted a deposition of Mr. Evans' partner that talks about how all these services that he was providing were normal accounting services, that providing investment advice, looking over the books of the company, these are all normal investing accounting services. So it's not just happening to be the same word judged being used in a different context. But let me ask you about the thing that bothered me the most about your position, and I understand the irony of this case because, you know, Evans because of what he did, the worse he acts, the harder it is for you to get coverage. So I appreciate the predicament you're in in this case. But the $32,000 that he got, is your position that that was not remuneration to him, but it was basically he stole that money? Our position, we are not arguing on appeal that that $32,000 went to Harner Evans and provided coverage under Section A of professional services. Right. So if he's pocketing that money, how is, getting back to my colleague's question from earlier, how is it pro bono if he is pocketing $32,000 from providing some service? Well, that gets to a factual question of what services he provided, what he was due, what the different investors in this company were due, what distributions were made that are not before the court and are not the question here. The question is whether he performed it in a way that a jury could find as pro bono. And we submitted that there's disputed facts, and we agree it could come out various ways, but that's up for a jury to decide and not for the judge to say it's resolved. Your position is that as far as Harner Evans is concerned, since they didn't get the $32,000, the services provided by Evans in counseling the structure of the investment were accountancy services rendered by Harner Evans, pro bono by Harner Evans, and then Evans got $32,000, which he didn't split with his partners. So they didn't get paid at all. Is that right? I believe that's generally correct. The issue is that he, yeah, that payment would have been for his membership or his partnership within Aegis Jet. It's a fine due fee, isn't it? It could have been, yes. And so transitioning, you mentioned the awkwardness or the strangeness of the situation where the shoe's on the other foot. The same is true for the insurance company. They, who are providing a defense for him now, are now attacking him. Arizona has recognized this conflict, and this goes to my second issue and the third issue that they've asked you to raise, which is Arizona has had an established rule for over 30 years that when there's this dispute, when there's a conflict of interest between the insured and the insurer, that those facts cannot be used in collateral estoppel. And that was all they submitted. If you look, they submitted their entire summary judgment statement of facts. It includes the jury's verdict. But it's not clear to me that either the district court or the other side, the insurance company here, is arguing for collateral estoppel. So you spilled a lot of ink on the issue of collateral estoppel, but I'm just not. My understanding of the district court's ruling and of their position is that the verdict against Evans is evidence against Evans and that Kuhl Radiators in this case didn't come forward with contrary evidence that would create a factual dispute on the issue of coverage. So why are you spending all this time talking about the collateral estoppel issue? Because it is being used that way. If it's not collateral estoppel, it can't be used as evidence. Why not? I mean, a jury verdict. You can take judicial notice of a jury verdict, can't you? For purposes such as impeaching a witness or something for some limited purposes like that. We don't hand one jury verdict to another jury and say weigh this other weighing of the facts and decide whether you agree with it or not. Okay, but you agree, jury verdict or no jury verdict, you agree that there is evidence in the record to support their position of no coverage. So what evidence do you have, what evidence do you have, that he did not have a basis to believe that his conduct would form the basis of a lawsuit? Yes, so first we would say there is no evidence that they submitted other than the jury verdict. But the evidence that we submitted in opposition to that is the affidavits from Aerojet CEO and from Aegisjet saying that their negotiations were ongoing, that they weren't done, that they hadn't given up, that they were still working on it and so that it wasn't incorrect and it wasn't a lie and there was no reason for him to know at the time that it wasn't going to work out. If there are no other questions, I'd like to reserve the balance of my time. Good afternoon, your honors, and may it please the court. My name is Leland Jones and I represent Apelli Continental Casualty in this matter. The district court correctly determined that there was no coverage under Harner Evans' accountant's professional liability policy for two reasons and this court can and honestly should affirm the district court's ruling and can do so on one of any three separate and independent grounds. The first ground, your honor, is that the insuring agreement under an accountant's professional liability policy, like many other professional liability policies, delineates between covered activities and uncovered activities for the professional and how it does so is that it specifically defines and delineates what constitutes a professional service under the policy. Here, the policy requires that a claim arise by reason of an act or omission in the performance of professional services and that's either acts in the practice of public accountancy or pro bono services. With respect to the first of acts in the performance of public accountancy, it requires that it actually be accounting work and I think the beginning and the end of the analysis that it should be for the court is that KRI steps into the shoes of Mr. Evans to pursue coverage under the policy. So I think the court should look at what did Mr. Evans say about the services that he was providing. He was soliciting a $250,000 investment for a third-party entity. Mr. Davis didn't make any claim against Evans or Horner Evans because of the negligent or unprofessional advice as to how to structure the investment, did they? That's correct. All he wanted was money back. That's correct. KRI wants its money back. It invested on the basis that representations were made as to that the money would be returned if an investment deal did not go through. The money was not returned. And what Mr. Evans testified is that when he was soliciting that investment for KRI, which is the very act upon which KRI seeks to recover from Mr. Evans and then from Continental, is he testified or provided testimony that he was, quote, acting as a member of Aegis like all members of Aegis were raising money. He also testified this was, quote, private business I'm doing on my own in my private life. Quote, this isn't a billable thing. This is my private business. He's soliciting a $250,000 as a member of a non-insured third party. So there's no coverage. And the definition of professional services further delineates besides the testimony and the fact that there's no error or omission arising from the performance of public accountancy. The policy also requires that there be some remuneration that goes to the benefit of the accounting firm itself. There's no evidence of that in this case, and KRI concedes that it can't point to any type of money that changed hands and went from KRI or Aegis to Harner Evans. So there cannot be any type of compensated service to trigger that portion of the definition of professional services. Secondly, with respect to pro bono services, pro bono services are provided to an indigent client. It's not a $250,000 investment for a third party entity of which the individual is hoping to seek a return on his or her individual behalf. Well, I don't know. I don't know if it has to be for an indigent client. I mean, none of the authorities you cited say that pro bono services have to be for an indigent client. That's correct, Your Honor, but the way they're And I don't understand why you're relying on that. I mean, you don't need to establish that pro bono services must be for an indigent client to win on your argument that these aren't pro bono services. You win on your argument that these aren't pro bono services, I think, because of the fact that he was soliciting money from cool radiators. I agree with you, Your Honor, is that the fact is that he's doing it as a third party, on behalf of a third party, to make money. I think that addresses the professional services. What relation does the $32,000 that he took out have to the $250,000? Your Honor, I don't know that it has anything other than the fact that the money didn't go to Harner Evans, the accounting firm, is that it's further indication that the work that Mr. Evans was doing as well as saying is in Arizona at the time, was it a custom and practice to take, say, 7 percent or 8 percent or something in between as a finder's fee for investments of this type? I don't know, Your Honor, but I think it's consistent with that Mr. Evans was acting not in his accounting capacity when he was soliciting the investment for KRI. Also, Your Honor, there are multiple other grounds on which the court should affirm the district court's decision. Also, as part of the insuring agreement in the policy, there was a requirement, as it makes sense, that Continental doesn't insure against known risks. And so to trigger coverage under this accounting professional liability policy, it requires that or indicates that there's no coverage if prior to the effective date of this policy, you had a basis to believe that any such act or omission or interrelated act or omission might reasonably be expected to be the basis of a claim. As the parties seeking coverage under the policy for Mr. Evans, KRI was required to come forward with some evidence indicating that Mr. Evans had no basis to believe that his actions in soliciting the investment. Well, this is an exclusion, right? You have the burden of proof on exclusion. No, Your Honor. This prior knowledge condition is a requirement of the policy's insuring agreement. It's part of the grant of coverage? Yes, Your Honor. Oh, okay. So that KRI has the burden of stepping into the shoes of Mr. Evans to make that proof. Here, all that Continental was required to do and did is presented evidence that there was a jury verdict finding that Mr. Evans in soliciting the investment from KRI committed common law fraud and securities fraud. And KRI made its investment based on those misrepresentations in August of 2007, over a year before Continental's policy incepted. And so Continental, as the party who wouldn't ultimately bear the burden at trial, met its burden that there were no genuine issues of material fact for summary judgment. KRI came forward with no specific evidence that before the inception of this policy, Mr. Evans had no basis to believe that a claim wouldn't be made. So Continental has met its burden in that respect, and because KRI has not come forward with any additional evidence to create a genuine issue of material fact, it provides another ground for this court to affirm the district court's ruling. This court also has a third basis to affirm the district court's ruling, and it's on a basis that the district court did not actually make a specific finding on, but it's based on the fraud exclusion under the policy. The policy provides that Continental doesn't provide coverage for, quote, any claim based on or arising out of a dishonest, illegal, fraudulent, criminal, or malicious act by any of you. Here again, Continental came forward with evidence that a jury found that Mr. Evans committed common law fraud and securities fraud. But maybe he didn't. I mean, maybe he was just bullheaded. Maybe he just believed that he was going to get it done eventually. I mean, you're not arguing, I don't think, that the jury verdict is preclusive in this case, are you? I think Continental is making that argument. I don't think that this court has to make that determination whether it has preclusive effect or not, because the fact is that Continental came forward with admissible evidence of this jury verdict, so the court need not make that determination. And all of the causes of action in the underlying action are based on representations with respect to solicitation of this $250,000 investment. They all arise out of what the underlying jury found was fraudulent conduct. So this exclusion also applies to the entire claim. What was the date of the inception of the policy as compared to the jury verdict? The inception of the policy was on September 10th of 2008, and the jury verdict was in June of 2013, Your Honor. June of 2013. So the jury hadn't found fraud at the time of the policy's inception. That's correct, Your Honor. But the jury did make a finding that at the time that Mr. Evans made the solicitation and representations regarding the investment, that those representations were made in July and August of 2007, a year before the inception of Continental's policy. But the jury didn't make a specific finding about which statements were fraudulent, did it? No, Your Honor, it did not. But the policy doesn't require Continental to parse that. It does create a situation of you have multiple causes of action or representations that may or may not be fraudulent. But the way that the policy is defined with respect to the fraud exclusion is that it applies to, quote, any claim based on or arising out of fraudulent conduct. But you have to point to conduct that you believe gave Evans a basis to believe would give rise to a claim or was fraudulent in which you haven't said anything about which conduct it is that you believe was fraudulent. Your Honor, the jury did not make that finding. I'm not asking what the jury did. I'm asking what conduct are you pointing to that you say gave Evans a basis to believe that his conduct would give rise to a lawsuit or that was fraudulent? What was it? You want us to just sort of say it was fraud without being able to identify what conduct actually was fraudulent? I don't think the court is required to make that specific determination. It's only in that in this underlying lawsuit the jury made a finding of both common law fraud and securities fraud. It's not required to point to a specific. What finding do you contend? What conduct do you contend was fraudulent? I think the continental contendence is that all the conduct is fraudulent. But laid out, here is how he committed fraud. He committed fraud in indicating that. What did he say that was fraud? The specific misrepresentation would be that if the deal didn't go through, Aegis was going to use the money that it raised from investors to buy another airplane charter company. And that deal, he made the representation that if that deal did not go through, that the earnest money that was being provided in the deal would be returned. That was not, in fact, true. What he said was that Kuhl Radiator's investment was going to be refundable. And what evidence is there that he did not believe that it was going to be refundable when he made that statement? Where in the record is there evidence of that? There's nothing in that the specific evidence in the record, Your Honor, is that the jury verdict, the finding of common law fraud and securities fraud. And the jury didn't parse the specific representations that were the basis for a securities fraud determination or a common law fraud determination. But the way that the policy's fraud exclusion as well as the prior knowledge condition are defined doesn't require that Continental actually make that parse that. The policy provides that. But I would think we would have to parse that if we were to rule in your favor on that question, on either your second point or your third point. What was the conduct that he engaged in that gave him a basis to believe that there may be a claim? I mean, I don't see how we could say that he engaged in conduct that gave him the basis to believe that there would be a claim against him at the time without identifying that conduct.  I think, Your Honor, from Continental's perspective, it is the jury. The beginning and the end on those questions is the jury verdict itself. And the way that the policy defines claim and interrelated act or omissions is that all of Mr. Evans' omissions, whether representations with respect to the solicitation of the investment and KRI, involve a single claim, a single lawsuit, and they arise from interrelated acts or omissions, which based on that policy language, the court doesn't actually have to parse any of the representations that were made or any basis upon which Mr. Evans was found to have committed common law fraud or securities fraud. What was the action brought against Evans by Kuhl? When was that action filed? The first action was filed in 2009, Your Honor. And then a second action was filed. There was an issue with a dismissal of that one. It went on appeal. And then the suit that ultimately led to the verdict in this case was filed in 2011. And, Your Honor, unless there are any other questions, we would respectfully request that this court affirm the district court's decision on any one of these three separate and independent grounds. Thank you, Your Honors. I'd like to make two points. You just heard Connell say that the jury verdict is the beginning and the end of their case on these second two cases. If that's it, this is collateral estoppel. You can dress it up and make any arguments that it's evidence that you want, but that's what they're doing. Arizona is clear. This court has adopted it. And this court needs to follow Arizona's precedent, which is those issues can be relitigated. They're under dispute. The other question, which seemed to be foremost on your mind, is how can he be doing this on behalf of Aegis and perhaps making money out of that, and yet it be pro bono? And the answer to that is the restatement of agency, Section 226 that we cited, which is that he can be doing this under multiple hats. He can be doing it on behalf of Aegis and his membership in there. He can also be doing it at the same time on behalf of Harner Evans and his interest as an accountant, his interest in maintaining a relationship with our client, providing investment advice, and earning his business in the future. And so there's really no problem with him making money on it in his other hat and providing it as an accounting person pro bono. So to go back to my hypothetical, I say to you, look, I've got some pro bono advice for you. I'm wearing my hat of investment advisor now, pro bono investment advisor, and I'm going to give you this advice pro bono, and my pro bono advice to you is invest in my company. And when I get your money, I'm going to be wearing the hat of a shareholder in that company. That makes it pro bono work because I'm saying that I'm doing it while wearing two different hats at the same time. That's correct. As to the policy, it is pro bono if he, as a partner, authorizes performing it without remuneration. And this relationship that you're talking about, this hypothetical relationship, is one of an accountant who is providing accounting services and has provided accounting services to a client, and is coming to that client and saying, here's another investment. I'm also the accountant for this company, and I reviewed their books, all these things. He's making representations as an accountant and in his capacity as an accountant. And if he chooses to do that on his own, it is in the capacity of Harner Evans, and it is covered. And, again, there is disputed evidence on both sides. We submitted our contrary statement of facts with hundreds of pages of deposition about why this wasn't fraud, why they felt it wasn't fraud. And we respectfully ask that these issues be remanded so that they can be submitted to a jury. Thank you very much. Thank you, both counsel. The case of Continental Casualty Company v. Kuhl Radiators will be submitted.
judges: Bea, Owens, Chhabria